

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TERRICK L. THOMPKINS.

    Petitioner,

V.

DWAYNE SANTISTEVAN, et al.,

    Respondents.

_____/

No. 2:21-cv-0005 KWR/DLM

AMENDED 28 U.S.C. § 2254

WRIT OF HABEAS CORPUS

## AMENDED 28 U.S.C. § 2254 WRIT OF HABEAS CORPUS

  Comes Now, Petitioner Terrick L. Thompkins pursuant to the Honorable Damian L. Martinez, United States Magistrate Judge's Proposed Findings and Recommended Disposition (Doc 22) and hereby submits Petitioner's amended petition minus the unexhausted grounds previously submitted, grounds 1,3,8 and 14(b) – (d). Petitioner respectfully withdraws those unexhausted grounds. Petitioner requests the Court take judicial notice of the records and files in this case. Further, Petitioner hereby incorporates all valid facts and arguments previously submitted which tend to support the grounds and arguments submitted herein.

  Upon further consideration of the grounds previously raised, Petitioner respectfully withdraws them all, with the exception of the following ground.

GROUND:

### A. INSUFFICIENT EVIDENCE TO OVERCOME THE INSANITY/DIMINISHED CAPACITY DEFENSE

Stated another way, the State failed to prove, beyond a reasonable doubt, that Petitioner was sane during the commission of the crimes. There is no question that Petitioner is responsible for these crimes or that Petitioner committed them and that Petitioner considered, from a psychotic perspective, committing these actions well in advance of the actual events. The question is whether Petitioner is legally and morally responsible? The answer, No! Petitioner is not responsible due to insanity.

FACTS:

### THE DEFENDANT SUFFERED FROM A MENTAL DISEASE AT THE COMMISSION OF THE CRIMES

At the outset of this case, Petitioner did introduce evidence reasonably tending to show him insane. The Court then determined that there was sufficient evidence to take the insanity question to the jury and thus adhered to its duty and instructed the jury on the question of insanity.

At trial, Dr. Eric Westfried testified that Petitioner suffered from severe PTSD and a Terminal Brain Injury (TBI) and that it interfered with his function [5/21/18 – 1:32:14]. Further, the doctor testified that Petitioner suffers a "Nero-cognitive Disorder" and "Personality Disorder" [5/21/18 – 1:33:48] as a result of the TBI and that this diagnosis is long standing and chronic [5/21/18- 1:29:15]. Also, the doctor testified that Petitioner's medical disorders 'affects mental processes and behavioral controls' [5/21/18 – 1:29:11]. It was the doctor's testimony that Petitioner was psychotic, that Petitioner would have met the criteria of dementia, [5/21/18 –

[2]

10:24:57] that Petitioner suffers a severe clinical disorder, major depression, delusional disorder, paranoia and can become unglued from reality. [5/21/18 – 11:19:09].

Additionally, Dr. Gary Jackson testified that Petitioner was on medication for PTSD and those medications can give rise to 'night terrors and audible hallucinations'. [5/18/18 – 2:10:53]. Petitioner was in fact hearing voices. [5/18/18 – 10:59:42]. Dr. Westfried concurred with the V.A. doctors' diagnosis of "severe and persistent mental illness." [5/21/18 – 2:00:36], and that Petitioner was 100% disabled. [5/21/18 – 2:02:19]. It was Dr. Westfried's conclusion that Petitioner "was unable to control his own behavior, to stop himself," on the evening of the events, [5/21/18 – 1:35:16], that "he had a loss of control at that point. [5/21/18 – 3:06:20].

## THE DEFENDANT COULD NOT STOP HIMSELF FROM COMMITTING THE CRIMES

In evidence was the fact that Petitioner made mention of his homicidal ideations to numerous People prior to the event. People who were not suffering from mental disease, people who ostensibly could have taken steps to prevent those homicidal ideations from becoming a reality. Witness #10, Linda Chaparro testified that Petitioner expressed his homicidal thoughts to her at least six to ten times prior to the incident, [5/16/18 – 1:31:32]. Witness #18, Ronnie Garcia testified that *Petitioner asked him* a couple of times to take him to Albuquerque to the veteran's hospital so he could see doctors for treatment because a lot of his *medications weren't working* [5/18/18-11:37:59]. In evidence was the fact that Petitioner sought treatment for his mental conditions from the V.A. hospital for years, [5/18/18 – 10:59:10], that Petitioner was hearing voices and having nightmares [5/18/18 – 10:59:42]. Further, that this had occurred "too many times. *He'd always ask for help* and they would maybe keep him for twenty-four hours and send him home or change his meds and send him back home." [5/18/18 – 11:00:05]. In the 911

[3]

call, as dispatcher Jason Luzano works to talk Petitioner out of committing suicide, Petitioner states: "Nobody understands, motherfucking, I go through this hell every fucking day, every fucking night, I'm fucking going through this and doing this and that and I'm trying to keep my mind out of it just for my children. *It's like I'm trying to keep hold but I can't...*" [10:51:57]. Petitioner said this in reference to the hell experienced in Afghanistan and Iraq. Petitioner stated, "Nobody's gonna help." "I went to the V.A. for help, they told me I'm too far gone." Petitioner stated he walked up in there and told them "My mind is fucked up, please help me" [10:55:47]. Petitioner asked to speak with a doctor the night of the event. [5/21/18 – 4:54:03]. Also in evidence was the fact that Petitioner told himself "Don't do it, don't do it!" trying to admonish himself, trying to talk himself out of committing the crimes, [5/21/18 – 5:20:24], and ultimately, Petitioner was unable to stop himself from doing it. Dr. Segel testified that this was a "significant statement to his analysis" and the fact that Petitioner said this to himself was "a demonstration of [Petitioner's] thought processes". [5/21/18 – 5:20:38].

## THE STATE PRESENTED INSUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT THAT PETITIONER WAS SANE AT THE TIME WHEN PETITIONER COMMITTED THE CRIMES

It was the state's burden to prove, beyond a reasonable doubt, that Petitioner was sane at the commission of the crimes. In light of the overwhelming amount of evidence that Petitioner suffered a long standing, chronic mental disorder and that Petitioner loss control and could not stop himself from committing the crimes, the state called a single witness to establish that Petitioner was sane and to meet its burden of proof. Of the twenty-one witnesses called to testify in Petitioner's trial, the state presented one witness in this regard, Dr. Ned Segel, Clinical Psychologist. Dr. Segel was presented to rebut the expert testimony establishing insanity. When

asked whether he concurred with Dr. Westfried's determination that Petitioner could not prevent himself from committing the acts, Dr. Segel said 'No.' and when asked, why not? Dr. Segel responded "*Well, I don't really know why*. I guess that's where he and I part company. Uh, I could not or I did not hear an explanation of loss of control. There's no evidence that he loss control." So, the evidence could have been presented but he simply couldn't and/or didn't hear it and thus Petitioner must have been sane? The doctor equates loss of control to being in a panicked state, running through the woods, blindly crashing into branches, needing to get away from *it*, is a panic state and that Petitioner was not in a panic state [5/21/18 – 4:07:30], he stated "this was completely different." [5/21/18 – 4:08:25] thereby indicating that Petitioner must have been in control. Dr. Segel indicates that "good control" can be obtained "by whatever virtue, via treatment, *medication*, will, religion" [5/21/18 - ]. When asked whether or not Petitioner had a mental disease that substantially affected his mental processes and substantially impaired his behavior controls, Dr. Segel replied "No." [5/21/18 – 3:54:27] and when asked what his conclusion was based upon he stated Petitioner had "made a plan and followed through with it." [5/21/18 – 3:54:55]. Dr. Segel admits that he reviewed the 998 pages of records in this case [5/21/18 – 4:19:40] and thus he was well aware that the V.A. doctors who had been treating Petitioner for years diagnosed Petitioner to be psychotic and that Petitioner was prescribed Haldol, an anti-psychotic medication. Further, Dr. Segel was present at the Competency hearing on 6/7/16 and testified that Petitioner was competent to stand trial. At that hearing, Dr. Caplan testified that Petitioner was taking Haldol and "Haldol is an anti-psychotic, a major anti-psychotic medication." [6/7/16 – 1:47:55]. So, Dr. Segel knew or should have known that competent doctors had diagnosed Petitioner as psychotic long before the tragic event and were treating Petitioner with this *major anti-psychotic medication*. However, when asked if he knew

[5]

what drugs Petitioner had stopped taking, he testified "I know there was an anti-depressant, maybe an anti-anxiety. I can't recall from memory right now but there were several, I think four, if I remember correctly." [5/21/18 – 5:04:02]. So, Dr. Segel refused acknowledge before the jury any knowledge of Petitioner taking anti-psychotic medications, which could mean that he didn't want the jury to question why he disagreed with the doctors who diagnosed Petitioner as psychotic or he didn't know the facts of the case sufficiently to make an intelligent assessment of Petitioner's mental condition at the time the crimes were committed. If Dr. Segel admits he knew Petitioner to be taking anti-psychotic medications, the jury might assume the medications were prescribed for good cause and Dr. Segel would cease to be of use to the state as a rebuttal witness. Further, if Dr. Segel concurs with all the rest of the competent, highly trained specialist the same would hold true, he would be yet another witness for the defense. Consequently, Dr. Segel cannot acknowledge that Petitioner was psychotic without losing his function. Dr. Segel testified to numerous things that were not in evidence, that Petitioner must have been doing good mentally for the court to have awarded him custody of the children; that the military would not have placed Petitioner back into combat with a TBI [5/21/18 – 4:40:06]; that Petitioner stopped taking his medications '*as part of his plan to put himself in a disordered state*' [5/21/18 – 5:01:00].

Argument:

In evidence was the fact that Petitioner was formerly a United States Marine. Trained by the U.S. government, he was a Marksman, a Sniper, a Rifleman who, in this regard, achieved the highest level attainable in the Corps. [5/21/18 – 4:31:05]. Further, that Petitioner saw hundreds of deaths. [5/21/18 – 4:32:10]. Petitioner was trained for lethal missions, trained to perform his

duties with lethal efficiency in service of his country. That's what war is. Bullet riddled bodies, bodies torn to pieces from explosions, burning bodies, a virtual hell from which many soldiers return broken, both physically and mentally. Petitioner spoke with the 911 dispatcher about that living hell and how he goes through it 'every fucking day, every fucking night'. Petitioner could not escape the horrors of the deaths he saw or the deaths he caused. War was a living nightmare that haunted him day and night. Unable to rid himself of the nightmares, Petitioner was unable to distinguish between that reality and *his* day to day reality. Petitioner became "unglued" from reality and could not rid himself of the audible hallucinations, the homicidal and suicidal ideations and Petitioner sought help. Government doctors diagnosed and treated Petitioner for years and Petitioner maintained tenuous control by and through medications, which didn't always work and often times had to be switched or changed to adjust to Petitioner's need. Petitioner was trying to "keep hold" but he couldn't.

In evidence was the fact that Petitioner had stopped taking his medications, [5/21/18 – 5:02:00], but Dr. Segel wasn't willing to acknowledge that off those medications loss of control could have and did occur in this case. Dr. Segel wasn't willing to admit this truth, instead, he testified that Petitioner stopped taking his medications "as part of his plan to put himself in a disordered state." [5/21/18 – 5:01:00]. There was no evidence to support this damaging assertion from the doctor and no reason for him to introduce facts not in evidence other than he was expected to be an 'adverse witness' and contradict the expert witnesses testimony of the defense. This is what the State paid Dr. Segel to do. He was asked if the V.A. hospital's changing of Petitioner's medications caused him concern and he admitted it caused him some, [5/21/18 – 5:03:18], however, when asked if he knew what drugs Petitioner had been taking and had stopped he replied that he couldn't recall from memory the meds Petitioner stopped taking, 'anti-depressant,

anti-anxiety' [5/21/18 – 5:04:21]. Dr. Segel specifically disagreed with Dr. Westfried as to whether Petitioner was psychotic [5/21/18 – 3:59:41] and yet, Petitioner's medical records clearly establish the V.A. doctors were treating Petitioner with Haldol, an anti-psychotic medication to treat his psychotic condition. Psychosis means that basically you're out of touch with reality. Dr. Segel did not offer any evidence that a person out of touch with reality could control his homicidal and suicidal impulses and stop themselves from committing a criminal act. Dr. Westfried testified that Petitioner's mental disease, medical disorder, affects mental processes and behavioral controls. [5/21/18 – 1:29:11].

One accused of a crime is presumed to be sane. To rebut the presumption of sanity, a defendant must only introduce some competent evidence to support the allegation of insanity. State v. Hartley, 90 N.M. 488, 565 P.2d 658 (1977) Accord: State v. Lopez, 581 P.2d 872 (1978). The burden then shifts to the State to prove beyond a reasonable doubt that the defendant was sane at the time the act was committed. Lopez, at 873.

Crimes involving a guilty intent cannot be successfully prosecuted against one charged who is insane, because an insane person does not have the capacity to form a criminal intent. Therefore, the burden of proof is upon the state to prove that the defendant is sane beyond a reasonable doubt. State v. James, 83 N.M. 263, 490 P.2d 1236 (1971).

The sanity of the accused must be proven by the state just like any other material fact. For the purpose of clarifying the rule of law applicable to the defense of insanity in criminal cases in this jurisdiction, we state it to be as follows: 'The jury must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind… (a) Did not know the nature and quality of the act or (b) did not know it was wrong or (c) was incapable of preventing himself from committing it. Satisfactory proof of the existence of either one or more of the three

tests is sufficient to bar a guilty verdict. James Id. Again, when asked why he did not concur with Dr. Westfried as to Petitioner being incapable of stopping himself from committing the acts, Dr. Segel testified, *"Well, I don't really know why."* And the Dr. knew Petitioner had stopped taking his meds but couldn't recall that Petitioner was taking anti-psychotic meds and yet he disagreed that Petitioner was psychotic. This was not proof beyond a reasonable doubt.

Questions:

- Would the State's expert have concluded that Petitioner was psychotic had he been able to recall that one of the medications Petitioner had stopped taking was Haldol, a major anti-psychotic?
- Would the State's expert have concluded that Petitioner could have stopped himself from committing the criminal acts while operating from a "detached reality"?
- Would the jury have concluded that Petitioner was sane had Dr. Segel testified to the same conclusions based upon being fully informed and acknowledging that he knew about the major anti-psychotic medication not taken?
- Would the jury have afforded the same weight and credibility to the doctor's conclusions that Petitioner could have stopped himself from committing the acts and that Petitioner was not psychotic had he admitted to them that he was aware that V.A. doctors had previously diagnosed Petitioner as psychotic, treated him with major anti-psychotic medication and he was aware that Petitioner had stopped taking it?
- Did the State's expert introduce facts, not in evidence based upon bias, speculation, or clinical deduction that Petitioner had stopped taking his medications "as part of his plan to put himself in a disordered state"?

Petitioner requests that the Court order an evidentiary hearing be held to answer these questions and determine whether the State proved Petitioner sane, as was required.

Conclusion

The fact that these crimes occurred is without question an indescribable tragedy. Petitioner committed these crimes but he did so with a diseased mind, detached from reality, wrestling with night terrors, suffering audible hallucinations, with a traumatic brain injury affecting behavioral control. Petitioner was trained to kill in service of this country and war took its toll on Petitioner's mind as it does on many soldiers. The horrors of what Petitioner witnessed and was required to do eventually drove Petitioner to a break with reality and Petitioner's psychotic mind was filled with thoughts of killing and suicide. Medications allowed Petitioner some control for a while but never complete control and never permanent. Like many veterans, Petitioner turned to alcohol as a much needed self-medication as the horrible mindset would not go away.

Petitioner is sorry for the actions he committed and the loss everyone suffered, the victims and the survivors.

Respectfully submitted,

Terrick L. Thompkins
Petitioner

DATED: This 15th day of November, 2023.

Drafted on behalf of Petitioner by Tony Williams, #78000



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TERRICK L. THOMPKINS.

    Petitioner,

V.

DWAYNE SANTISTEVAN, et al.,

    Respondents.

_____/

No. 2:21-cv-0005 KWR/DLM

AFFIDAVIT OF INMATE ASSISTANT (WILLIAMS)

## AFFIDAVIT OF INMATE ASSISTANT

Comes Now inmate Tony Alan Williams, #78000, "Affiant hereinafter and deposes and says:

1. Affiant is above the age of eighteen and is fully competent to attest to the matters herein.

2. On October, 31, 2023, while receiving legal mail, Affiant observed inmate Terrick Thompkins receive Doc. 22, with a 21 day deadline.

3. Mr. Thompkins requested Affiant assist him with the preparation and filing of the amended writ.

4. Affiant would consider Mr. Thompkins "disabled" pursuant to NMCD Policy CD-121000 (K) Special Needs Inmates, and is qualified to receive assistance.

5. There is no "Designated Staff" available at NENMCF to assist inmates in "preparation and filing" of qualified legal claims as set forth in CD-121000(B) (3).

6. In accordance with Johnson v. Avery, 393 U.S. 483, 490 n.11 (1969), Affiant assisted Mr. Thompkins in this matter.

[1]

[2]

7. Having reviewed the issues Mr. Thompkins previously submitted, Affiant felt that they were not meritorious and should not be pursued and advised Mr. Thompkins of such.

8. Should the Court order an evidentiary hearing in this matter, it is Affiant's opinion that Mr. Thompkins will not be able to effectively represent himself and will require appointed counsel's assistance.

Further Affiant Sayeth Naught.

DATED: This 12th day of November, 2023.

Tony Williams
Affiant


I, Tony Williams, #78000, do hereby swear, under penalty of perjury, that the foregoing is true and correct.

DATED: This 12th day of November, 2023.

Tony Williams

## Certificate of Mailing

I, Terrick L. Thompkins, do hereby certify that on this 15th day of November, 2023, I did place in the U.S. Mail, postage pre-paid, for filing, a true and correct copy of the following documents:

AMENDED §2254 WRIT OF HABEAS CORPUS;

AFFIDAVIT OF INMATE ASSISTANT;

CERTIFICATE OF MAILING

Addressed To:

United States District Court
District of New Mexico
Office of the Clerk
Suite 270
333 Lomas Blvd. N.W.
Albuquerque, New Mexico 87102

Raul Torres
Attorney General, New Mexico
P.O. Drawer 1508
Santa Fe, New Mexico 875004-1508

LEGAL MAIL

Terrick L. Thompkins, # 62422
NENMCF
1185 Dr. Michael Jenkins Rd
Clayton, NM 88415

RECEIVED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO
NOV 20 2023
MITCHELL R. ELFERS
CLERK

United States District Court
District of New Mexico
Office of the Clerk
333 Lomas Blvd. N.W.
Suite 270
Albuquerque, New Mexico 87102