IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TERRICK L. THOMPKINS,

    Petitioner,

                                                    No. 2:21-cv-0005 KWR/DLM

DWAYNE SANTISTEVAN, *et al.*,

    Respondents.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Petitioner Terrick L. Thompkins's Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus. (Doc. 24.) Respondents filed an answer (Doc. 26), and Thompkins filed a reply brief. (Doc. 29). Having considered the record and the relevant law, I find Thompkins's claim is meritless and recommend the Court deny the amended petition.[1]

**I.  Factual and Procedural Background**

On May 25, 2018, a jury in the Twelfth Judicial District for the State of New Mexico found Thompkins guilty on eight counts: <u>Counts 1–2</u>: first-degree murder; <u>Count 3</u>: child abuse resulting in great bodily harm; <u>Count 4</u>: aggravated burglary; <u>Count 5</u>: shooting at a dwelling causing great bodily harm; and <u>Counts 6–8</u>: child abuse not resulting in death or great bodily harm. (Docs. 14-1 at 1–3, 105–17.) On July 10, 2018, the state district court sentenced Thompkins to two consecutive terms of life imprisonment plus 46 years. (*Id.* at 123.) Thompkins's convictions arose out of the

---

[1] United States District Judge Kea W. Riggs entered an Order of Reference on March 23, 2023, referring this case to the undersigned magistrate judge "to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case." (Doc. 20.)

following events.²

On March 12, 2015, Thompkins, a military veteran "who had been drinking and had a 'good buzz going,' set" an alarm to go off between 9:00 and 10:00 p.m. (*Id.* at 244, 318.) When his alarm sounded, Thompkins "said 'it's go time.'" (*Id.*) He donned "full tactical gear and armed himself with several guns and ammunition." (*Id.*) Thompkins drove to the home of his ex-wife (Jessica), her boyfriend (Phillip), and the couple's four children, two of whom (G.T. and I.T.) are also Thompkins's children. (*Id.* at 244–45.)

Thompkins approached the house "and fired seven bullets into the front door in the shape of a 'T,' which" is his nickname. (*Id.* at 244.) Upon entering the home, he pointed a firearm at J.D., Jessica's oldest son, then lowered it and made his way to the bedroom that G.T. and I.T. shared. (*Id.* at 244–45.) His children and Jessica were in that bedroom. (*See id.*) Thompkins shot and killed Jessica. (*Id.* at 245.) Thompkins moved to the master bedroom, where Phillip and J.D. were hiding. (*Id.*) Phillip was blocking the door with his body and a dresser. (*Id.*) Thompkins fired shots through the door, killing Phillip. (*Id.*) "J.D. managed to escape by climbing out of the bedroom window[] but was hit in the chest with shrapnel from the gun fire."³ (*Id.*)

"After killing Jessica and Phillip, [Thompkins] returned to his home and called 911." (*Id.* at 246.) He told the dispatcher his address and stated, "Yeah, uh, I just killed my ex-wife[,] . . . I'm standing outside. Please come get me." (*Id.*) He called 911 again and said, "I was a great father to my kids and now you took my kids away. And yeah, I killed her. And you know what? I don't feel bad about it." (*Id.*) Thompkins told the 911 "dispatcher that he was going to 'finish off' some

---

² The Court's recitation of the facts primarily comes from the New Mexico Supreme Court's decision denying Thompkins' direct appeal. (*See* Doc. 14-1 at 244–48.)

³ Although J.D. survived, "[t]he shrapnel lodged near his heart and could not be removed because of a blood-clotting disorder." (*See* Doc. 14 at 2–3 (citing Doc. 14-JJ at 197).)

Everclear." (*Id.*) The dispatcher knew Thompkins personally and kept him on the line until police arrived and Thompkins surrendered. (*Id.*) Police attempted to interview Thompkins that night but ended the interview when Thompkins became incoherent and mentioned medication. (*See id.*)

Officers took him to the hospital, where he was treated for "out of control" diabetes. (*Id.*) Officers interviewed Thompkins again when he was released from the hospital. (*See id.* at 247.) They learned that Thompkins previously had full custody of G.T. and I.T. (*See id.* at 247.) The day prior to the crimes, however, officials removed the children from Thompkins' home due to a note that I.T. passed at school. (*See id.*) The note, which a teacher intercepted and gave to authorities, stated that Thompkins "had dropped I.T. and punched her in the stomach." (*Id.*) Thompkins told law enforcement that after he lost custody, "he 'just wanted to kill everyone.'" (*Id.*) He "'made sure everything was ready to go' and 'took off to Jessica's.'" (*Id.*) When he reached her home, he "told himself 'don't do it' in contemplation, but proceeded inside anyway." (*Id.*) Thompkins "remembered seeing Jessica and remembered being 'in the room.'" (*Id.*) He asserted that "Jessica was [his] 'objective' and he 'finished her off' with an AR-15." (*Id.*) He "did not want Phillip around his kids because he was a 'meth head.'" (*Id.*) Thompkins "saw Phillip blocking the door as he tried to enter the master bedroom and confirmed that he 'probably sprayed the door with lead.'" (*Id.*)

Thompkins asserted an insanity defense at trial. (*See id.* at 248.) Witnesses who testified at trial included:

(1) Thompkins's girlfriend, Linda Chaparro, testified that "every time [Thompkins] became angry with Jessica, he would say 'I should go down the street, kick in her door, shoot her, shoot her boyfriend, and shoot her two bastard children.'" (*See id.* at 257–58).)

(2) Dr. Gary Jackson "reviewed [Thompkins's] military and medical records" and testified

3

about Thompkins's mental health diagnoses, including post-traumatic stress disorder (PTSD), anxiety, schizoaffective disorder, and depression. (*See id.* at 252–53.) Thompkins "had been awarded 100 percent disability as a result of his PTSD diagnosis and a traumatic brain injury that [he] suffered during his military service." (*Id.* at 253.) Jackson testified that Thompkins was being treated for PTSD with medications to stabilize 'manic thoughts and depression.'"[4] (*Id.*) Jackson stated that on the night of the crimes, Thompkins "was admitted to the hospital for 'mental confusion . . . .'" (*Id.* at 252.)

(3) Dr. Eric Westfried testified in support of Thompkins's insanity defense and discussed Thompkins's "longstanding" problems with "anxiety, PTSD, and paranoia that caused [him] to become 'unglued from reality.'" (*See id.* at 253.) He also discussed an IQ drop "from 122 to 107 as a result of brain damage." (*Id.*) Westfried testified that Thompkins "experienced a 'traumatic event' when his children were removed and 'could not prevent' the actions that followed due to a 'loss of control.'" (*Id.*) He admitted, however, that he "had not reviewed [Thompkins's] video-recorded police interview" and "that [Thompkins's] contemplation about whether to go into Jessica's home on the night of the incident would 'potentially' change his opinion with respect to deliberate intention." (*Id.* at 254.) He "also stated that, hypothetically, pointing and then lowering a gun would demonstrate 'a choice[,]' but" he could not explain what was "going on" when Thompkins pointed the gun at J.D. and then lowered it. (*Id.*) "Westfried conceded that [Thompkins's] statement on the 911 call that he had killed Jessica and 'didn't even feel bad about it' was a commentary on right versus wrong.'" (*Id.*) And Westfried acknowledged "that he was unaware of any threats" Thompkins previously made about the murders, which "would be 'a real

---

[4] Thompkins asserts Jackson testified that the "medications can give rise to 'night terrors and audible hallucinations.'" (Doc. 24 at 3.) Thompkins cites to a transcript that is not in the record. Even assuming Thompkins is accurately recounting Jackson's testimony, the Court's findings and recommendation would not change.

4

concern' that should be considered as to premeditation." (*Id.*)

(4) Dr. Ned Siegel testified for the State regarding the insanity defense. (*See id.*) Siegel agreed Thompkins had longstanding mental health issues, but he did not believe those issues caused Thompkins to commit the crimes. (*See id.* at 255 ("there was no link between [Thompkins's] PTSD and the events").) In fact, he opined, Thompkins had been "doing pretty good[,]" as he had full custody of his children, held down a job, and "did some legal work on his own behalf." (*Id.*) Moreover, Thompkins's "comment during his police interview that he had not been in trouble for the last seven or eight years showed [he] had control of his behavior." (*Id.*) Siegel noted that Thompkins made multiple "'declarations and plans' to 'kill people' and 'embarked on his plan.'" (*Id.*) Siegel reasoned Thompkins "knew what he was doing and understood the consequences of his actions" because he "'debat[ed] with himself' whether or not to go inside the house on the night of the incident." (*Id.* at 255–56.) He opined it was clear Thompkins "knew the 'act was wrong'" because of his later statements to the dispatcher "that he did not feel bad about killing Jessica . . . ." (*Id.* at 256.) Siegel disagreed with Westfried that there was any evidence that Thompkins lost control, disassociated, "had an 'out of body experience[,]' or 'blacked out.'" (*See id.*) He found it telling that Thompkins "was able to recall his conversation with the dispatcher three days after the incident during his second police interview, made a conscious decision to lower his weapon when he first encountered J.D. at Jessica's home, and change his original plan from suicide to 'suicide by cop,' which showed deliberation." (*Id.*) "Siegel believed [Thompkins's] behavior was 'goal-oriented conduct' that demonstrated a plan . . . ." (*Id.*)

"Thompkins moved for a directed verdict on the basis of insanity." (Doc. 14 at 5.) "The state district court denied the motion." (*Id.* (citing Doc. 14-1 at 248).) The jury found Thompkins guilty as charged. (*See id.*) Thompkins filed a direct appeal to the New Mexico Supreme

5

Court. (Doc. 14-1 at 126.) Relevant here, Thompkins argued that the state district court erred in refusing to grant his motion for directed verdict. (*See id.* at 154–66.) On April 6, 2020, the New Mexico Supreme Court affirmed the judgment and sentence. (*See id.* at 243.)

On July 14, 2020, Thompkins filed a pro se petition for writ of habeas corpus in the state district court.[5] (Doc. 14-1 at 272.) The state district court entered a Summary Dismissal on September 3, 2020. (*See id.* at 327.) On October 5, 2020, Thompkins petitioned the New Mexico Supreme Court for a writ of certiorari. (*See id.* at 329.) On October 14, 2020, the state supreme court denied the petition. (*Id.* at 359.)

Thompkins filed his original Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody on January 4, 2021, raising 14 claims. (Doc. 1.) Respondents filed a limited answer on November 14, 2022, arguing Thompkins filed a mixed petition containing both exhausted and unexhausted claims. (*See* Doc. 14.) The Court entered a Proposed Findings and Recommended Disposition (PFRD) and "recommend[ed] the Court give Thompkins 21 days to voluntarily dismiss the unexhausted claims." (Doc. 22 at 1.) In response, Thompkins filed an Amended 28 U.S.C. § 2254 Writ of Habeas Corpus, withdrawing *all* claims—unexhausted and exhausted—with the exception of one: he argues there was "insufficient evidence to overcome the insanity/diminished capacity defense." (Doc. 24 at 1–2 (capitalization omitted).) As discussed below, the Court recommends Thompkins's petition be denied.

## II. Legal Standards

### A. Pro Se Litigant

Because Thompkins is proceeding pro se, the Court will construe his pleadings liberally

---

[5] The Court's October 19, 2023 Proposed Findings and Recommended Disposition discusses Thompkins's direct appeal and state habeas petition in more detail. (*See* Doc. 22 at 3–6.)

and hold them "to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

### B.  28 U.S.C. § 2254 Standard

28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, governs Thompkins's petition. When a state court has adjudicated a claim on the merits, habeas relief under § 2254(d) is not available unless the state-court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). The Court's review of the state court's decision is "highly deferential." *See Cortez-Lazcano v. Whitten*, 81 F.4th 1074, 1082 (10th Cir. 2023) (citing 28 U.S.C. § 2254(d)).

### C.  Standard Applicable to Sufficiency of the Evidence Claims

"A sufficiency-of-the-evidence challenge in a habeas petition presents a mixed question of fact and law." *Hooks v. Workman*, 689 F.3d 1148, 1165 (10th Cir. 2012) (citing *Brown v. Sirmons*, 515 F.3d 1072, 1089 (10th Cir. 2008)). The Court must "ask whether the facts are correct and whether the law was properly applied to the facts," and thus "'appl[ies] both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas.'" *Id.* (quoting *Brown*, 515 F.3d at 1089).

The Court's analysis is governed by the Supreme Court's opinion in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Meek v. Martin*, 74 F.4th 1223, 1252 (10th Cir. 2023). Under *Jackson*, the "[C]ourt must evaluate the evidence to determine whether 'any rational trier of fact' could have found the defendant sane beyond a reasonable doubt." *See Valdez v. Ward*, 219 F.3d 1222, 1236

(10th Cir. 2000), *holding modified on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001) (quoting *Jackson*, 443 U.S. at 319). This standard "takes a highly deferential approach to the jury's verdict" and recognizes the jury's responsibility "fairly to resolve conflicts in . . . testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *See Meek*, 74 F.4th at 1252 (quotation marks and citations omitted). "Where the record might support 'conflicting inferences,' [the Court] presume[s] . . . [the] jury[] 'resolved any such conflicts in favor of the prosecution.'" *Id.* (quoting *Jackson*, 443 U.S. at 326) (citing *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996) ("The Court may not weigh conflicting evidence nor consider the credibility of witnesses.")). The Court is not to decide "whether the jury's determination of guilt was 'correct[,]'" but "whether it was 'rational.'" *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)) (citing *Messer*, 74 F.3d at 1013) ("[T]he Court must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'").

"Where a sufficiency challenge was resolved on the merits by the state courts, . . . ADEPA 'adds an additional degree of deference,' and the" Court must determine whether the state court's "conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Hooks*, 689 F.3d at 1166 (quoting *Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007)) (subsequent citation omitted). The Court must "view the [New Mexico Supreme Court's] assessment of the jury's verdict through AEDPA's deferential prism." *Meek*, 74 F.4th at 1252 (citing *Coleman v. Johnson*, 566 U.S. 650, 651 (2012)). "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *See id.* "The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)) (citing *Coleman*, 566 U.S. at 651).

8

**III.    The Court recommends denying Thompkins's amended petition.**

Thompkins argues that there was insufficient evidence to prove beyond a reasonable doubt that he was sane at the time he committed the crimes. (*See* Doc. 24 at 8.) Under New Mexico law, "there is an initial presumption that a defendant is sane." *New Mexico v. Martinez*, 483 P.3d 590, 601 (N.M. 2021) (citing *New Mexico v. Dorsey*, 603 P.2d 717, 718 (N.M. 1979)). Because Thompkins introduced "competent evidence to support the allegation of insanity[,]" the burden "shift[ed] to the State to prove beyond a reasonable doubt that [Thompkins] was sane at the time the act was committed." *Id.* (quotations omitted). "However, 'the state [is] not required to affirmatively prove sanity but could rather rely on the presumption.'" *Id.* at 601–02 (quoting *New Mexico v. Wilson*, 514 P.2d 603, 606 (N.M. 1973)).

The state district court instructed the jury that it must find Thompkins "was insane at the time of the commission of the crime if, because of a mental disease, . . . [he] did not know what he was doing or understand the consequences of his act, or did not know that his act was wrong, or could not prevent himself from committing the act." (*See, e.g.*, Doc. 14-1 at 36.) *See also* NMRA UJI 14-5101. The only element of the jury instruction at issue here is whether Thompkins "should have been found insane because he 'could not prevent himself from committing the act.'" *See Martinez*, 483 P.3d at 602. (*See also* Doc. 24 at 3.)

Thompkins's arguments here are similar to those he raised on direct appeal. (*See* Docs. 14-1 at 154–66; 24.) Thompkins emphasizes evidence to show he suffered from a longstanding mental disorder at the time of the crimes. (Doc. 24 at 3–4.) He asserts that he asked for assistance for his mental health symptoms prior to the crimes, but without adequate treatment he "was unable to stop himself from" committing the crimes. (*Id.*) He relies heavily on Dr. Westfried's testimony that Thompkins's "mental disease . . . affects mental processes and behavioral controls." (*Id.* at 8.) He

9

discusses the testimony of Dr. Siegel, the State's expert witness, and argues that Siegel's testimony was insufficient to prove his sanity. (*See id.* at 4–6.) In particular, Thompkins points out that when asked why Siegel did not concur with Westfried's determination that Thompkins could not prevent himself from committing the crimes, Siegel said, "Well, I don't really know why. . . . There's no evidence that he los[t] control." (*Id.* at 5.) Thompkins asserts that Siegel's failure to remember the name of Thompkins's medications was tantamount to a "refus[al to] acknowledge [to] the jury" that Thompkins was taking anti-psychotic medications. (*See id.* at 6.) In a nutshell, Thompkins contends that Siegel "did not offer any evidence" to establish that Thompkins, who was allegedly "out of touch with reality[,] could control his homicidal and suicidal impulses and stop [himself] from committing" the crimes at issue. (*See id.* at 8.)

Respondents outline testimony they argue supports the jury's verdict. They highlight Chaparro's testimony, which revealed that Thompkins "repeatedly spoke negatively about Jessica" and "stated more than once that he should kick in the door to Jessica's home, 'shoot her, shoot her boyfriend, and shoot her two bastard children.'" (Doc. 26 at 11 (quoting Doc. 14-1 at 257–58).) Respondents also reference Thompkins's own conduct to show that he had not "lost control" during the crimes: for example, Thompkins pointed his firearm at J.D. before lowering it and moving away; he told himself "Don't do it" before entering the house; and he admitted responsibility for killing Jessica to the 911 dispatcher and "expressly showed no remorse and suggested that he killed Jessica because he had lost custody of the children." (Doc. 26 at 11–12 (citing Docs. 14-1 at 244, 246, 254; 24 at 4).)

Thompkins fails to show that the State's evidence was so "blatantly contradicted by the record . . . that no reasonable jury could believe it." *See Torres v. Santistevan*, No. CV 19-00209 JB/JHR, 2019 WL 6522750, at *9 (D.N.M. Dec. 4, 2019), *R&R adopted*, 2020 WL 901627

(D.N.M. Feb. 25, 2020) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). He suggests that Siegel was unreliable and unfamiliar with the relevant facts (*see, e.g.*, Doc. 24 at 5–7), yet this Court is constrained from "second-guess[ing] the jury's credibility determinations or 'reassess[ing] the jury's conclusions about the weight of the evidence presented.'" *See Torres*, 2019 WL 6522750, at *9 (quoting *United States v. Johnson*, 57 F.3d 968, 971 (10th Cir. 1995)). Further, he fails to demonstrate that the jury's "finding was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656.

In light of the deference that this Court must give to the jury "and the 'sharply limited nature of constitutional sufficiency review[,]'" the Court "must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'" *Barger v. Oklahoma*, 238 F. App'x 343, 346 (10th Cir. 2007) (quoting *Wright v. West*, 505 U.S. 277, 296 (1992); *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir.1993)). Given the conflicting evidence, it is clear the jury's resolution of the issue of Thompkins's sanity was well "within the bounds of reason." *See id.* (quotation omitted).

Nor has Thompkins established that the New Mexico Supreme Court's conclusion was contrary to federal law or "objectively unreasonable." *See Gibson v. Schnurr*, No. 22-3272, 2023 WL 3858563, at *1 (10th Cir. June 7, 2023) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). In a thorough and thoughtful opinion, the state supreme court examined the conflicting evidence. (*See* Doc. 14-1 at 248–56.) Critically, the court reviewed several admissions Westfried made on cross-examination. (*Id.* at 254.) For example, Westfried "had not reviewed [Thompkins's] video-recorded police interview[ and] admitted that [Thompkins's] contemplation about whether to go into Jessica's home on the night of the incident would 'potentially' change his opinion with respect to deliberate intention." (*Id.*) Moreover, Westfried "was unaware of" Thompkins's previous threats

11

against Jessica (as testified to by Chaparro), "and acknowledged that threats made within weeks before the murders would be 'a real concern' that should be considered as to premeditation." (*Id.*)

The court also closely examined Siegel's testimony. (*Id.* at 254–56.) Siegel disagreed with Westfried that Thompkins lost control. (*See id.*) Siegel emphasized that Thompkins made "declarations and plans" regarding the murders "and 'embarked on his plan.'" (*Id.* at 255.) Siegel found it telling that Thompkins "'debat[ed] with himself' whether to go inside the house on the night of the incident." (*Id.* at 255–56.) He also noted that Thompkins "was able to recall his conversation with the dispatcher three days after the incident during his second police interview, made a conscious decision to lower his weapon when he first encountered J.D. . . . , and changed his original plan from suicide to 'suicide by cop,' which showed deliberation." (*Id.* at 256.)

The New Mexico Supreme Court outlined the relevant law, beginning with state law on the insanity defense. (*Id.* at 249 (citing *Wilson*, 514 P.2d at 606).) It stated that "[w]here there is conflicting evidence regarding a defendant's insanity, the defendant's sanity presents a question of fact to be determined by the jury." (*Id.* at 249 (citing *New Mexico v. Moore*, 76 P.2d 19, 30 (N.M. 1938)).) The court noted that its "review of the denial of a directed verdict motion asks whether sufficient evidence was adduced to support the underlying charge."[6] (*Id.* (quoting *New Mexico v. Sena*, 192 P.3d 1198, 1201 (N.M. 2008)).) The state supreme court affirmed the trial court's denial of the directed verdict motion and opined that "[b]ecause the evidence in this case was clearly disputed, the determination of [Thompkins's] sanity was a question for the jury to decide." (*Id.* at 256.) That the court relied on *Sena*, a state case, rather than *Jackson*, makes no

---

[6] Thompkins seems to argue in his reply brief that the state supreme court did not rule on his sufficiency of the evidence argument. (*See* Doc. 29 at 2 ("The Supreme Court was afforded an opportunity to address this issue and passed on it.").) Given the court's recitation of the relevant law on sufficiency of the evidence claims (*see* Doc. 14-1 at 249), the Court disagrees.

12

difference. *See Valdez*, 219 F.3d at 1238. The *Sena* court, and thus the state supreme court in this case, correctly "applied the *Jackson* standard for a sufficiency of evidence review." *See id.*; *see also Sena*, 192 P.3d at 1201–02 (noting that a reviewing court "views the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict while at the same time asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'") (quotation omitted).

In sum, I find that "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found" that the State proved Thompkins's sanity "beyond a reasonable doubt." *See Hooks*, 689 F.3d at 1165–66 (quoting *Jackson*, 443 U.S. at 307). I further find that the New Mexico Supreme Court reasonably applied the *Jackson* standard. *See id.* at 1166. Accordingly, I recommend denying Thompkins's amended petition.

## IV. The Court recommends denying Thompkins's request for an evidentiary hearing.

Thompkins seeks an evidentiary hearing to ask specific questions about Siegel's testimony so that the Court may "determine whether the State proved [he was] sane . . . ." (*See* Doc. 24 at 9.) The Court need not hold an evidentiary hearing where, as here, the "claims are capable of resolution on the record . . . ." *Torres v. Mullin*, 317 F.3d 1145, 1161 (10th Cir. 2003) (citation omitted). I recommend the Court deny the request for an evidentiary hearing.

## V. Conclusion

**IT IS HEREBY RECOMMENDED** that the Amended 28 U.S.C. § 2254 Writ of Habeas Corpus Petition (Doc. 24) be **DENIED** and that a certificate of appealability be **DENIED**.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the 14-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
DAMIAN L. MARTINEZ
UNITED STATES MAGISTRATE JUDGE